Citation Nr: 1045641 
Decision Date: 12/06/10 Archive Date: 12/14/10

DOCKET NO. 06-17 174 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Detroit, 
Michigan

THE ISSUES

1. Entitlement to service connection for diabetes mellitus, type 
II, claimed as due to herbicide exposure.

2. Entitlement to service connection for amputation of the right 
great toe, disarticulation at the metatarsophalangeal joint, 
claimed as secondary to diabetes mellitus, type II.

3. Entitlement to service connection for peripheral vascular 
disease of the right lower extremity, claimed as secondary to 
diabetes mellitus, type II.

4. Entitlement to service connection for peripheral vascular 
disease of the left lower extremity, claimed as secondary to 
diabetes mellitus, type II.

5. Entitlement to service connection for peripheral neuropathy 
of the right lower extremity, claimed as secondary to diabetes 
mellitus, type II.

6. Entitlement to service connection for peripheral neuropathy 
of the left lower extremity, claimed as secondary to diabetes 
mellitus, type II.

7. Entitlement to service connection for ulcer of the left knee, 
claimed as secondary to diabetes mellitus, type II.

8. Entitlement to service connection for hypertension, claimed 
as secondary to diabetes mellitus, type II.

9. Entitlement to service connection for erectile dysfunction, 
claimed as secondary to diabetes mellitus, type II.

10. Entitlement to service connection for ulcers of the feet, 
claimed as secondary to diabetes mellitus, type II.

11. Entitlement to service connection for diabetic retinopathy, 
claimed as secondary to diabetes mellitus, type II.

12. Entitlement to service connection for cataracts of the eyes, 
claimed as secondary to diabetes mellitus, type II.

13. Entitlement to service connection for a skin condition, 
claimed as jungle rot due to herbicide exposure.

14. Entitlement to service connection for an enlarged prostate, 
claimed as due to herbicide exposure.

15. Entitlement to a total disability rating based on individual 
unemployability due to service-connected disability (TDIU).

16. Entitlement to special monthly compensation (SMC) based on 
the need for regular aid and attendance.

REPRESENTATION

Veteran represented by: Michael A. Viterna, Esq.

ATTORNEY FOR THE BOARD

Arif Syed, Associate Counsel

INTRODUCTION

The Veteran served on active duty from January 1968 to January 
1971.

This matter comes before the Board of Veterans' Appeals (BVA or 
Board) on appeal from a November 2005 rating decision of the 
Department of Veterans Affairs (VA) Regional Office (RO) in 
Detroit, Michigan, which denied the benefits sought on appeal. 
The Veteran appealed that decision to BVA, and the case was 
referred to the Board for appellate review.

In May 2009, the Board remanded the Veteran's claims. The 
Appeals Management Center (AMC) continued the previous denial of 
the claims in a June 2010 supplemental statement of the case 
(SSOC). Accordingly, the Veteran's VA claims folder has been 
returned to the Board for further appellate proceedings.

As will be discussed in detail below, in September 2005, 
subsequent to the initial adjudication of the Veteran's diabetes 
claim, the RO obtained the Veteran's service personnel records 
and associated them with his claims folder. These personnel 
records included the Veteran's record of assignments, 
specifically service in Thailand where, as will be discussed in 
greater detail below, the Board has found that the Veteran was 
exposed to herbicides. 

Under 38 C.F.R. § 3.156(c)(1) (2010), "at any time after VA 
issues a decision on a claim, if VA receives or associates with 
the claims file relevant official service department records that 
existed and had not been associated with the claims file when VA 
first decided the claim, VA will reconsider the claim ... Such 
records include, but are not limited to: (i) Service records that 
are related to a claimed in-service event, injury or disease ... 
(ii) Additional service records forwarded by the Department of 
Defense or the service department of VA any time after VA's 
original request for service records; and (iii) Declassified 
records that could not have been obtained because the records 
were classified when VA decided the claim." The Board finds 
that the personnel records are clearly relevant and of probative 
value to the Veteran's diabetes, right great toe amputation, 
peripheral vascular disease of the bilateral lower extremities, 
peripheral neuropathy of the bilateral lower extremities, left 
knee ulcer, and hypertension claims, as it demonstrates in-
service exposure to herbicides. The Board will therefore 
reconsider the Veteran's claims and is redenominating the issues 
on appeal to entitlement to service connection for diabetes, 
right great toe amputation, peripheral vascular disease of the 
bilateral lower extremities, peripheral neuropathy of the 
bilateral lower extremities, left knee ulcer, and hypertension 
pursuant to 38 C.F.R. § 3.156(c). 

The issues of entitlement to service connection for hypertension 
and erectile dysfunction, both claimed as secondary to diabetes 
mellitus, type II; a skin condition and an enlarged prostate, 
both claimed as due to herbicide exposure; TDIU; and SMC are 
addressed in the REMAND portion of the decision below and are 
REMANDED to the RO via the Appeals Management Center (AMC), in 
Washington, DC.

FINDINGS OF FACT

1. The medical evidence of record shows that the Veteran has a 
current diagnosis of diabetes mellitus, type II.

2. The preponderance of the evidence of record shows that the 
Veteran was exposed to herbicide agents during active military 
service. The evidence therefore links the Veteran's diabetes 
mellitus to his in-service herbicide exposure.
3. The competent and probative evidence of record serves to link 
the Veteran's currently diagnosed amputation of the right great 
toe, disarticulation at the metatarsophalangeal joint, to his 
service-connected diabetes mellitus, type II.

4. The competent and probative evidence of record serves to link 
the Veteran's currently diagnosed peripheral vascular disease of 
the bilateral lower extremities to his service-connected diabetes 
mellitus, type II.

5. The competent and probative evidence of record serves to link 
the Veteran's currently diagnosed peripheral neuropathy of the 
bilateral lower extremities to his service-connected diabetes 
mellitus, type II.

6. The competent and probative evidence of record serves to link 
the Veteran's currently diagnosed ulcer of the left knee to his 
service-connected diabetes mellitus, type II.

7. The competent and probative evidence of record serves to link 
the Veteran's currently diagnosed ulcers of the feet to his 
service-connected diabetes mellitus, type II.

8. The competent and probative evidence of record serves to link 
the Veteran's currently diagnosed diabetic retinopathy to his 
service-connected diabetes mellitus, type II.

9. The competent and probative evidence of record serves to link 
the Veteran's currently diagnosed cataracts to his service-
connected diabetes mellitus, type II.

CONCLUSIONS OF LAW

1. Diabetes mellitus, type II, was incurred in active military 
service. 38 U.S.C.A. §§ 1110, 1116, 5103A, 5107 (West 
2002); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2010).

2. The Veteran's currently diagnosed right great toe amputation, 
disarticulation at the metatarsophalangeal joint, is a result of 
his service-connected diabetes mellitus, type II. 38 C.F.R. § 
3.310 (2010).

3. The Veteran's currently diagnosed peripheral vascular disease 
of the bilateral lower extremities is a result of his service-
connected diabetes mellitus, type II. 38 C.F.R. § 3.310 (2010).

4. The Veteran's currently diagnosed peripheral neuropathy of 
the bilateral lower extremities is a result of his service-
connected diabetes mellitus, type II. 38 C.F.R. § 3.310 (2010).

5. The Veteran's currently diagnosed ulcer of the left knee is a 
result of his service-connected diabetes mellitus, type II. 
38 C.F.R. § 3.310 (2010).

6. The Veteran's currently diagnosed ulcers of the feet is a 
result of his service-connected diabetes mellitus, type II. 
38 C.F.R. § 3.310 (2010).

7. The Veteran's currently diagnosed diabetic retinopathy is a 
result of his service-connected diabetes mellitus, type II. 
38 C.F.R. § 3.310 (2010).

8. The Veteran's currently diagnosed cataracts disability is a 
result of his service-connected diabetes mellitus, type II. 
38 C.F.R. § 3.310 (2010).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran seeks entitlement to service connection for diabetes 
mellitus, a right great toe amputation, peripheral vascular 
disease of the bilateral lower extremities, peripheral neuropathy 
of the bilateral lower extremities, a left knee ulcer, ulcers of 
the feet, diabetic retinopathy, and cataracts. 

The Board will first discuss certain preliminary matters. The 
issues on appeal will then be analyzed and a decision rendered.
Stegall concerns

As indicated above, in May 2009, the Board remanded these claims 
and ordered either the agency of original jurisdiction (AOJ) or 
AMC to ask the Veteran for information to be used in clarifying 
his service in Thailand and whether he set foot in Vietnam. If 
the Veteran indicated that he set foot in Vietnam, he was asked 
to provide details of his service in Vietnam. Further, the 
Veteran's claimed herbicide exposure in Thailand was to be 
verified pursuant to VA's Adjudication Procedure Manual, M21-1MR, 
Part IV, Subpart ii, Chapter 2, Section C.10.n. 

Pursuant to the Board's remand instructions, the AMC sent a 
letter to the Veteran requesting that he identify whether he 
served in the Republic of Vietnam, and if so , provide details of 
his service, to include when, where, and how he was exposed to 
herbicides, as well in service other than Vietnam that involved 
exposure to herbicides. Thereafter, the AMC furnished a 
description of the Veteran's claimed exposure to Compensation and 
Pension (C & P) and requested a review of Department of Defense's 
(DoD) inventory of herbicide operations to determine whether 
herbicides were used as contended. Further, the AMC requested 
verification of exposure to herbicides from the United States 
Joint Services Records Research Center (JSRRC). The Veteran's 
claims were readjudicated via the June 2010 SSOC. 

Accordingly, the Board's remand instructions have been complied 
with. See Stegall v. West, 11 Vet. App. 268, 271 (1998) [where 
the remand orders of the Board are not complied with, the Board 
errs as a matter of law when it fails to ensure compliance]. 

The Veterans Claims Assistance Act of 2000

The Board has given consideration to the Veterans Claims 
Assistance Act of 2000 (VCAA). The VCAA includes an enhanced 
duty on the part of VA to notify a claimant as to the information 
and evidence necessary to substantiate a claim for VA benefits. 
The VCAA also redefines the obligations of VA with respect to its 
statutory duty to assist a claimant in the development of a 
claim. See 38 U.S.C.A. §§ 5103, 5103A (West 2002).

A VCAA notice letter was sent to the Veteran regarding his 
service connection claims in May 2005. This letter appears to be 
adequate. The Board need not, however, discuss in detail the 
sufficiency of the VCAA notice letter in light of the fact that 
the Board is granting the claims. Any potential error on the 
part of VA in complying with the provisions of the VCAA has 
essentially been rendered moot by the Board's grant of the 
benefits sought on appeal.

The Board further notes that the Veteran received proper notice 
as to degree of disability and effective date in a March 2006 
letter, as required by the decision of the United States Court of 
Appeals for Veterans Claims (the Court) in Dingess v. Nicholson, 
19 Vet. App. 473 (2006). 

As discussed below, the Board is granting the Veteran's service 
connection claims. It is not the Board's responsibility to 
assign a disability rating or an effective date in the first 
instance. The RO will be responsible for addressing any notice 
defect with respect to the assignment of an initial disability 
rating and/or effective date when effectuating the award, and the 
Board is confident that the Veteran will be afforded appropriate 
notice under Dingess.

Accordingly, the Board will proceed to a decision as to the 
issues of diabetes mellitus, a right great toe amputation, 
peripheral vascular disease of the bilateral lower extremities, 
peripheral neuropathy of the bilateral lower extremities, a left 
knee ulcer, ulcers of the feet, diabetic retinopathy, and 
cataracts.

Service connection for Diabetes Mellitus

Pertinent legal criteria

Generally, service connection may be granted for disability or 
injury incurred in or aggravated by active military service. See 
38 U.S.C.A. §§ 1110, 1131 (West 2002); 38 C.F.R. § 3.303 (2010).

For certain chronic disorders, including diabetes mellitus, 
service connection may be granted if the disease becomes manifest 
to a compensable degree within one year following separation from 
service. 38 U.S.C.A. §§ 1101, 1112, 1113, 1137 (West 2002); 38 
C.F.R. §§ 3.307, 3.309 (2010).

In order to establish service connection for the claimed 
disorder, there must be 
(1) medical evidence of a current disability; (2) medical, or in 
certain circumstances, lay evidence of in-service incurrence or 
aggravation of a disease or injury; and (3) medical evidence of a 
nexus between the claimed in-service disease or injury and the 
current disability. See Hickson v. West, 12 Vet. App. 247, 253 
(1999). The determination as to whether these requirements are 
met is based on an analysis of all the evidence of record and the 
evaluation of its credibility and probative value. See Baldwin 
v. West, 13 Vet. App. 1, 8 (1999).

In order to show a chronic disease in service there is required a 
combination of manifestations sufficient to identify the disease 
entity, and sufficient observation to establish chronicity at the 
time, as distinguished from merely isolated findings or a 
diagnosis including the word "chronic." When the fact or 
chronicity in service is not adequately supported, then a showing 
of continuity after discharge is required to support a claim. 
There must be competent medical evidence unless the evidence 
relates to a condition as to which lay observation is competent 
to identify its existence. See 38 C.F.R. § 3.303(b) (2010).

A veteran who, during active military, naval, or air service, 
served in the Republic of Vietnam during the Vietnam era, shall 
be presumed to have been exposed during such service to an 
herbicide agent, unless there is affirmative evidence to 
establish that the veteran was not exposed to any such agent 
during that service. 38 U.S.C.A. § 1116; 38 C.F.R. § 
3.307(a)(6)(iii). If so, the veteran is thereby entitled to a 
presumption of service connection for certain disorders listed 
under 39 C.F.R. § 3.309(e). These diseases are chloracne; type 
II diabetes; Hodgkin's disease; chronic lymphocytic leukemia; 
multiple myeloma; non-Hodgkin's lymphoma; acute and subacute 
peripheral neuropathy (defined as transient peripheral neuropathy 
that appears within weeks or months of exposure to an herbicide 
agent and resolves within two years of the date of onset); 
porphyria cutanea tarda; prostate cancer; respiratory cancers; AL 
amyloidosis, and soft-tissue sarcomas (other than osteosarcoma, 
chondrosarcoma, Kaposi's sarcoma, or mesothelioma). 38 C.F.R. § 
3.309(e) (2010). 

The Secretary of the Department of Veterans Affairs has 
determined that a presumption of service connection based on 
exposure to herbicides used in the Republic of Vietnam during the 
Vietnam era is not warranted for: hepatobiliary cancers; oral, 
nasal, and pharyngeal cancer; bone and joint cancer; skin cancers 
(melanoma, basal, and squamous cell); breast cancer; female 
reproductive system cancer (cervix, uterus, ovary); testicular 
cancer; urinary bladder cancer; renal cancer; leukemia (other 
than chronic lymphocytic leukemia); abnormal sperm 
characteristics and infertility; spontaneous abortion; neonatal 
or infant death and stillbirth in offspring of exposed 
individuals; low birthweight in offspring of exposed individuals; 
birth defects (other than spina bifida) in offspring of exposed 
individuals; childhood cancer (including acute myelogenous 
leukemia) in offspring of exposed individuals; neurobehavioral 
disorders (cognitive and neuropsychiatric); movement disorders, 
including Parkinson's disease and amyotrophic lateral sclerosis; 
chronic peripheral nervous system disorders; respiratory 
disorders; gastrointestinal, metabolic, and digestive disorders 
(changes in liver enzymes, lipid abnormalities, ulcers); immune 
system disorders (immune suppression, autoimmunity); circulatory 
disorders; endometriosis; and effects of thyroid homeostasis; 
gastrointestinal tumors (esophagus, stomach, pancreas, colon, 
rectum); and brain tumors, or any other disability not specified. 
See Notice, 72 Fed.Reg. 32395-407 (June 12, 2007); See also 
Notice, 68 Fed.Reg. 27630 -27641 (May 20, 2003); See also Notice, 
67 Fed. Reg. 42600 (June 24, 2002); Notice, 66 Fed. Reg. 2376 
(Jan. 11, 2001); Notice, 64 Fed.Reg. 59232 (Nov. 2, 1999).
Notwithstanding the foregoing, the United States Court of Appeals 
for the Federal Circuit has determined that the Veterans' Dioxin 
and Radiation Exposure Compensation Standards (Radiation 
Compensation) Act, Pub. L. No. 98-542, § 5, 98 Stat. 2724, 2727- 
29 (1984), does not preclude a veteran from establishing service 
connection with proof of actual direct causation. Combee v. 
Brown, 34 F.3d 1039 (Fed.Cir. 1994). The Court has specifically 
held that the provisions of Combee are applicable in cases 
involving Agent Orange exposure. McCartt v. West, 12 Vet. App. 
164, 167 (1999).

Analysis

The Veteran is claiming entitlement to service connection for 
diabetes mellitus, type II, which he contends is due to his 
military service. See, e.g., the Veteran's notice of 
disagreement dated December 2005.

As noted above, in order for service connection to be granted, 
three elements must be present: (1) a current disability; (2) 
in-service incurrence of disease or injury; and (3) medical 
nexus. See Hickson, supra.

As to Hickson element (1), it is undisputed that the Veteran is 
currently diagnosed with diabetes mellitus, as is evidenced by 
the report of the November 2002 VA examination, as well as 
multiple VA treatment records. Hickson element (1) is, 
therefore, satisfied.

With regard to Hickson element (2), evidence of an in-service 
incurrence of a disease or injury, a review of the Veteran's 
service treatment records reveals no evidence of diabetes 
mellitus. Additionally, the record does not reflect medical 
evidence showing any manifestations of diabetes mellitus during 
the one-year presumptive period after the Veteran's separation 
from service. On the contrary, the record does not reflect any 
complaints of or treatment for diabetes prior to April 1980 (more 
than 9 years after his separation from active service). 
 
While all Veterans who served in the Republic of Vietnam during 
the Vietnam era are presumed to have been exposed to a herbicide 
agent, the Veteran's service personnel records do not show that 
he ever served in Vietnam. See 38 U.S.C.A. § 1116(f); 38 
C.F.R. § 3.307. Instead, the Veteran claims that he was exposed 
to herbicide agents while serving in Thailand.

The Veteran's service personnel records show that he served in 
Thailand from September 7, 1968 to August 28, 1969. The Veteran 
specifically contends that while serving in Camp Sami San in 
Sattahip, Thailand, which was half a mile from the U-Tapao Royal 
Thai Navy Airfield, the area was sprayed with what appeared to be 
Agent Orange. He also stated that he ran courier service as part 
of his duties between the camp and U-Tapao as well as Camp 
Vayama, and that the distance to U-Tapao in particular was 
"probably no more than one mile" and took him along the 
perimeter of the U-Tapao base. He further indicated that he 
served in the Gulf Coastal Waters, where B-52 bombers were 
deployed in Southeast Asia for assault on Vietnam. He swam in 
the waters, and performed on Guard duty on many occasions. 
Finally, he reported that herbicides were sprayed between 1968 
and 1969. 

The Veteran's claims are consistent with the evidence of record, 
which shows that he served in Thailand, and that he served as a 
company clerk which reasonably involved courier service. In 
addition, the evidence shows that Sattahip, Thailand was located 
only a few miles from U-Tapao Airfield. As there is no evidence 
that the Veteran was ever absent from his unit or otherwise 
assigned to another base, the evidence of record therefore shows 
that the Veteran served in Sattahip, Thailand as well as on or 
near U-Tapao Air Force Base during the entire duration of his 
service in Thailand.

The Board also notes that a declassified military report released 
by the DoD entitled "Project Checo Southeast Asia Report, Base 
Defense in Thailand" documents the use of herbicides in Thailand. 
In particular, the report discussed "physical defenses as they 
existed in Thailand from 1968 to 1972." It generally states that 
"herbicides were employed to assist in the difficult task of 
vegetation control" at most installations in Thailand. The 
report also specifically discussed U-Tapao Air Force Base, 
stating that "[d]ense jungles were rated as the greatest threat 
to the defenses at U-Tapao. . . . Vegetation control was all but 
impossible over the entire reservation. Vegetation control was 
further hindered by the inability of the base to get herbicides 
through supply channels during the entire first half of 1972." 
While this report does not specifically state that herbicides 
were used at U-Tapao in 1968 or 1969, it does provide information 
about extensive herbicide use at locations in Thailand during 
that time period, states that herbicides were used at most 
installations in Thailand, states that vegetation control was a 
major problem at U-Tapao, and shows that herbicides were being 
supplied to U-Tapao to control vegetation. Accordingly, the 
Board finds it is at least as likely as not that herbicides were 
used at the base at which the Veteran was stationed from 
September 1968 through August 1969. As such, applying the 
benefit of the doubt, the evidence of record shows that the 
Veteran was exposed to herbicide agents during active military 
service. 38 U.S.C.A. § 5107(b); Gilbert v. Derwinski, 1 Vet. 
App. 49 (1990).

Diabetes mellitus, type II is deemed associated with herbicide 
agent exposure under VA law. 38 U.S.C.A. § 1116; 38 C.F.R. §§ 
3.307, 3.309. Accordingly, as the evidence of record shows that 
the Veteran was exposed to herbicide agents during active 
military service, and the medical evidence shows a current 
diagnosis of diabetes mellitus, type II, service connection for 
diabetes mellitus, type II, is warranted.

Service connection for Right Great Toe Amputation, Peripheral 
Vascular Disease of the Bilateral Lower Extremities, Peripheral 
Neuropathy of the Bilateral Lower Extremities, Ulcer of the Left 
Knee, Ulcers of the Feet, Diabetic Retinopathy, and Cataracts

Because these issues involve the application of identical law to 
virtually identical facts, the Board will address them together. 

Pertinent Legal criteria

The law and regulations generally pertaining to service 
connection claims, continuity of symptomatology, and herbicide 
exposure has been set forth above and will not be repeated.

In addition to disabilities that were incurred in, or aggravated 
by, active military service, a disability which is proximately 
due to or the result of a service-connected disease or injury 
shall be service connected. When service connection is thus 
established for a secondary condition, the secondary condition 
shall be considered a part of the original condition. 38 C.F.R. 
§ 3.310 (2010); see also Harder v. Brown, 5 Vet. App. 183, 187 
(1993). Additional disability resulting from the aggravation of 
a non service-connected condition by a service-connected 
condition is also compensable under 38 C.F.R. § 3.310(a). See 
Allen v. Brown, 7 Vet. App. 439, 448 (1995).

With respect to secondary service connection, an analysis similar 
to the Court's decision in Hickson applies. There must be (1) 
evidence of a current disability; (2) evidence of a service-
connected disability; and (3) nexus evidence establishing a 
connection between the service-connected disability and the 
current disability. See Wallin v. West, 11 Vet. App. 509, 512 
(1998).

With respect to element (1), current disability, the record 
clearly demonstrates that the Veteran has current diagnoses of 
amputation of the right great toe, disarticulation at the 
metatarsophalangeal joint, peripheral vascular disease of the 
bilateral lower extremities, peripheral neuropathy of the 
bilateral lower extremities, ulcer of the left knee, ulcers of 
the feet, diabetic retinopathy, and cataracts. See the November 
2002 VA examination report; see also VA treatment records dated 
October 2003 and November 2003. Element (1) of Wallin is 
therefore satisfied.

Wallin element (2) has been met; the Veteran is service-connected 
for diabetes mellitus, type II.

Turning to Wallin element (3), medical nexus, in resolving the 
benefit of the doubt in the Veteran's favor, the competent 
medical evidence demonstrates that the Veteran's currently 
diagnosed right great toe amputation, peripheral vascular disease 
of the bilateral lower extremities, peripheral neuropathy of the 
bilateral lower extremities, ulcer of the left knee, ulcers of 
the feet, diabetic retinopathy, and cataracts are related to his 
service-connected diabetes mellitus. Specifically, the November 
2002 VA examiner concluded the following: 

"Peripheral neuropathy of both the lower extremities, most 
likely secondary to diabetes mellitus; status post amputation of 
the right first toe disarticulation at metatarsophalangeal joint 
... well-healed, secondary to complications due to diabetes 
mellitus; peripheral vascular disease ... Most likely, secondary to 
diabetes mellitus; and ulcer on left knee secondary to burn 
injury secondary to diabetes mellitus." 

Additionally, VA treatment records dated in October and November 
2003 document treatment for the Veteran's service-connected 
diabetes mellitus. Crucially, the VA treatment records indicate 
that complications of the Veteran's diabetes included diabetic 
retinopathy, cataracts, and ulcers of the feet. 

The report of the VA examiner as well as the VA treatment records 
appear to have been based upon a review of the Veteran's medical 
complaints, examination of the Veteran, and thoughtful analysis 
of the Veteran's entire history and current medical condition. 
See Bloom v. West, 12 Vet. App. 185, 187 (1999) [the probative 
value of a physician's statement is dependent, in part, upon the 
extent to which it reflects "clinical data or other rationale to 
support his opinion"]. 

Based on the foregoing, the Board concludes that the Veteran has 
been shown to have a status post amputation of the right great 
toe, peripheral vascular disease of the bilateral lower 
extremities, peripheral neuropathy of the bilateral lower 
extremities, a left knee ulcer, ulcers of the feet, diabetic 
retinopathy, and cataracts which are related to his service-
connected diabetes mellitus. The Board notes that there is no 
evidence showing otherwise. 

In summary, the Board concludes that service connection for 
amputation of the right great toe, peripheral vascular disease of 
the bilateral lower extremities, peripheral neuropathy of the 
bilateral lower extremities, a left knee ulcer, ulcers of the 
feet, diabetic retinopathy, and cataracts is warranted. 

ORDER

Entitlement to service connection for diabetes mellitus, type II, 
claimed as due to herbicide exposure, is granted.

Entitlement to service connection for amputation of the right 
great toe, disarticulation at the metatarsophalangeal joint, 
claimed as secondary to diabetes mellitus, type II, is granted.

Entitlement to service connection for peripheral vascular disease 
of the right lower extremity, claimed as secondary to diabetes 
mellitus, type II, is granted.

Entitlement to service connection for peripheral vascular disease 
of the left lower extremity, claimed as secondary to diabetes 
mellitus, type II, is granted.

Entitlement to service connection for peripheral neuropathy of 
the right lower extremity, claimed as secondary to diabetes 
mellitus, type II, is granted.

Entitlement to service connection for peripheral neuropathy of 
the left lower extremity, claimed as secondary to diabetes 
mellitus, type II, is granted.

Entitlement to service connection for ulcer of the left knee, 
claimed as secondary to diabetes mellitus, type II, is granted.

Entitlement to service connection for ulcers of the feet, claimed 
as secondary to diabetes mellitus, type II, is granted.

Entitlement to service connection for diabetic retinopathy, 
claimed as secondary to diabetes mellitus, type II, is granted.

Entitlement to service connection for cataracts of the eyes, 
claimed as secondary to diabetes mellitus, type II, is granted.

REMAND

For reasons expressed immediately below, the Board finds that the 
issues of entitlement to service connection for hypertension and 
erectile dysfunction, claimed as secondary to service-connected 
diabetes mellitus; entitlement to service connection for a skin 
condition and an enlarged prostate, to include as due to 
herbicide exposure; TDIU; and SMC must be remanded for additional 
evidentiary development. 

Service connection for Hypertension, Erectile Dysfunction, a Skin 
Condition, and an Enlarged Prostate

The Board initially notes that the Veteran has not claimed that 
his current hypertension and erectile dysfunction are a direct 
result of his military service, and there is nothing in the 
record which so suggests. Instead, he contends that the claimed 
conditions are secondary to his diabetes mellitus. See, e.g., 
the Veteran's claim for VA benefits dated in May 2005.

The Board notes, however, that the RO adjudicated the Veteran's 
hypertension and erectile dysfunction claims on both a direct and 
secondary basis. See the RO's November 2005 rating decision. In 
that connection, the Board's inquiry will similarly include 
analysis as to both direct and secondary service connection, as 
doing so does not prejudice the Veteran. Cf. Bernard v. Brown, 4 
Vet. App. 384 (1993).

As detailed above, in order to establish service connection, 
there must be (1) evidence of a current disability; (2) evidence 
of in-service incurrence of a disease or injury or evidence of a 
service-connected disability; and (3) evidence of a nexus between 
(1) and (2). See Hickson and Wallin, supra.

As to the first element-current disability, the medical evidence 
of record documents diagnoses of hypertension, erectile 
dysfunction, a skin condition (namely debrided skin), and a 
mildly enlarged prostate. See the November 2002 VA examination 
report and VA treatment records dated in October 2003 and April 
2005. With respect to the Veteran's mildly enlarged prostate, 
the medical evidence of record is pertinently absent any 
diagnosis of or treatment for prostate cancer.
 
With respect to Hickson element (2)-including in-service disease 
in particular, the Board notes that the service treatment records 
are negative for complaints of, treatment for, or findings of 
hypertension, erectile dysfunction, a skin condition, or an 
enlarged prostate. In fact, the service separation examination 
is absent any evidence of these disabilities. Additionally, 
there is no evidence that hypertension was manifested within the 
one year presumptive period after service found in 38 C.F.R. 
§ 3.309(a) (2010). Indeed, the first competent evidence of 
hypertension, erectile dysfunction, a skin condition, and an 
enlarged prostate is dated in March 1985, April 2005, October 
2003, and April 2005, respectively, which is many years after the 
Veteran's discharge from active duty. 

Concerning in-service injury, as discussed above, the Board 
concedes the Veteran's in-service exposure to Agent Orange. Of 
particular importance in this regard is the fact that service 
personnel records confirm the Veteran's service in Thailand 
between September 1968 and August 1969. His exposure to 
herbicides is, therefore, presumed. See 38 U.S.C.A. § 1116(f). 

According to 38 C.F.R. § 3.309(e) (2010), certain diseases may be 
presumed to be related to exposure to herbicides; hypertension, 
erectile dysfunction, debrided skin, and an enlarged prostate are 
not among the listed diseases. On August 31, 2010, the Secretary 
of VA published a final rule in the Federal Register amending 
38 C.F.R. § 3.309(e) to add, in part, ischemic heart disease as a 
presumptive condition. See 75 Fed. Reg. 53,202. Because 
ischemic heart disease refers only to heart disease, hypertension 
was not included. Therefore, hypertension may not be presumed to 
be related to herbicide exposure. However, service connection 
based on direct causation may still be established pursuant to 
Combee v. Brown, 34 F.3d 1039, 1042 (Fed. Cir. 1994).

With respect to element (3), medical nexus, the medical evidence 
currently associated with the Veteran's VA claims folder is 
absent an opinion as to a possible causal relationship between 
the Veteran's hypertension erectile dysfunction, skin 
debridement, and enlarge prostate and his in-service herbicide 
exposure. Moreover, the medical evidence is absent an opinion as 
to a possible causal relationship between the Veteran's erectile 
dysfunction and his service-connected diabetes mellitus. With 
respect to the Veteran's hypertension, the Board notes that the 
November 2002 VA examiner reported that the Veteran's 
hypertension is "not a complication of diabetes mellitus." 
Crucially, however, the VA examiner did not render an opinion as 
to whether the Veteran's hypertension was aggravated by his 
service-connected diabetes mellitus. See 38 C.F.R. § 3.310; 
Allen v. Brown, 7 Vet. App. 439, 448-49 (1995). 

In light of the foregoing, the Board is of the opinion that a 
clarifying VA examination would be probative in ascertaining 
whether the Veteran's hypertension, erectile dysfunction, skin 
disability, and enlarged prostate are related to his in-service 
herbicide exposure or are otherwise related to his military 
service, as well as whether the hypertension and erectile 
dysfunction are related to the service-connected diabetes 
mellitus. See Charles v. Principi, 16 Vet. App. 370 (2002); 
McLendon v. Nicholson, 20 Vet. App. 79 (2006); see also 38 C.F.R. 
§ 3.159(c)(4) (2010) (holding a medical examination or opinion is 
necessary if the information and evidence of record does not 
contain sufficient medical evidence to decide the claim). 

An additional factor that needs to be considered is the Court's 
holding in McClain v. Nicholson, 21 Vet App 319 (2007) that the 
requirement that a current disability be present is satisfied 
when a claimant has a disability at the time a claim for VA 
disability compensation is filed or during the pendency of that 
claim, even though the disability resolves prior to the 
adjudication of the claim. The Board cannot exclude the 
possibility that the Veteran exhibited hypertension, erectile 
dysfunction, a skin disability, and an enlarge prostate during 
the pendency of this appeal that had resolved. In the event that 
further VA examinations do not show current hypertension, 
erectile dysfunction, a skin disability, or an enlarged prostate, 
the type of scenario addressed under McClain must be addressed on 
examination as well.

TDIU

It is the established policy of VA that all veterans who are 
unable to secure and follow a substantially gainful occupation by 
reason of service-connected disabilities shall be rated totally 
disabled. 38 C.F.R. § 4.16. A finding of total disability is 
appropriate "when there is present any impairment of mind or body 
which is sufficient to render it impossible for the average 
person to follow a substantially gainful occupation." 38 C.F.R. 
§§ 3.340(a)(1), 4.15.

"Substantially gainful employment" is that employment "which is 
ordinarily followed by the nondisabled to earn their livelihood 
with earnings common to the particular occupation in the 
community where the veteran resides." Moore v. Derwinski, 1 Vet. 
App. 356, 358 (1991). "Marginal employment shall not be 
considered substantially gainful employment." 38 C.F.R. § 
4.16(a).

The Court noted the following standard announced by the United 
States Court of Appeals for the Eighth Circuit in Timmerman v. 
Weinberger, 510 F.2d 439, 442 (8th Cir. 1975):

It is clear that the Veteran need not be a total 'basket case' 
before the courts find that there is an inability to engage in 
substantial gainful activity. The question must be looked at in a 
practical manner, and mere theoretical ability to engage in 
substantial gainful employment is not a sufficient basis to deny 
benefits. The test is whether a particular job is realistically 
within the physical and mental capabilities of the Veteran.

A claim for a total disability rating based upon individual 
unemployability "presupposes that the rating for the (service- 
connected) condition is less than 100%, and only asks for TDIU 
because of 'subjective' factors that the 'objective' rating does 
not consider." See Vettese v. Brown, 7 Vet. App. 31, 34-35 
(1994).

In Hatlestad v. Derwinski, 1 Vet. App. 164 (1991), the Court 
referred to apparent conflicts in the regulations pertaining to 
individual unemployability benefits. Specifically, the Court 
indicated there was a need to discuss whether the standard 
delineated in the controlling regulations was an "objective" one 
based on the average industrial impairment or a "subjective" one 
based upon the veteran's actual industrial impairment. In a 
pertinent precedent decision, the VA General Counsel concluded 
that the controlling VA regulations generally provide that 
veterans who, in light of their individual circumstances, but 
without regard to age, are unable to secure and follow a 
substantially gainful occupation as the result of service- 
connected disability shall be rated totally disabled, without 
regard to whether an average person would be rendered 
unemployable by the circumstances. Thus, the criteria include a 
subjective standard. It was also determined that 
"unemployability" is synonymous with inability to secure and 
follow a substantially gainful occupation. See VAOPGCPREC 75-91.

In determining whether unemployability exists, consideration may 
be given to the veteran's level of education, special training 
and previous work experience, but not to his age or to any 
impairment caused by non service-connected disabilities. 38 
C.F.R. §§ 3.341, 4.16, 4.19.

A total disability rating for compensation may be assigned, where 
the schedular rating is less than total, when the disabled person 
is, in the judgment of the rating agency, unable to secure or 
follow a substantially gainful occupation as a result of service- 
connected disabilities, provided that, if there is only one such 
disability, this disability shall be ratable at 60 percent or 
more. If there are two or more disabilities, there shall be at 
least one disability ratable at 40 percent or more and the 
combined rating must be 70 percent or more. 38 C.F.R. § 4.16(a).

Pursuant to 38 C.F.R. § 4.16(b), when a Veteran is unable to 
secure and follow a substantially gainful occupation by reason of 
service-connected disabilities, but fails to meet the percentage 
requirements for eligibility for a total rating set forth in 38 
C.F.R. § 4.16(a), such case shall be submitted for extraschedular 
consideration in accordance with 38 C.F.R. § 3.321.

The medical evidence currently associated with the Veteran's VA 
claims folder is absent an opinion as to the effect of the 
Veteran's service-connected disabilities on his employability 
including the now service connected diabetes mellitus and 
associated disabilities. In light of the foregoing, the Board is 
of the opinion that a clarifying VA examination would be 
probative in ascertaining whether the Veteran's service-connected 
disabilities prevent him from obtaining substantially gainful 
employment. See Charles and McLendon, both supra; see also 
38 C.F.R. § 3.159(c)(4).

SMC

Special monthly compensation (SMC) is payable at a specified rate 
if the veteran, as the result of service-connected disability, is 
in need of regular aid and attendance. Need for aid and 
attendance means helplessness or is so nearly helpless as to 
require the regular aid and attendance of another person. A 
veteran will be considered to be in need of regular aid and 
attendance if he or she is blind or is so nearly blind as to have 
corrected visual acuity of 5/200 or less, in both eyes, or 
concentric contraction of the visual field to 5 degrees or less; 
if the veteran is a patient in a nursing home because of mental 
or physical incapacity; or if the evidence establishes a factual 
need for aid and attendance or "permanently bedridden" status 
under the criteria set forth in 38 C.F.R. § 3.352(a). See 38 
U.S.C.A. § 1114(l) (West 2002); 38 C.F.R. § 3.351(b) (2010).

The following will be accorded consideration in determining the 
need for regular aid and attendance: inability of claimant to 
dress or undress himself, or to keep himself ordinarily clean and 
presentable; frequent need of adjustment of any special 
prosthetic or orthopedic appliances which by reason of the 
particular disability cannot be done without aid (this will not 
include the adjustment of appliances which normal persons would 
be unable to adjust without aid, such as supports, belts, lacing 
at the back, etc.); inability of claimant to feed himself through 
loss of coordination of upper extremities or through extreme 
weakness; inability to attend to the wants of nature; or 
incapacity, physical or mental, which requires care or assistance 
on a regular basis to protect the claimant from hazards or 
dangers incident to his or her daily environment. "Bedridden" 
will be a proper basis for the determination. See 38 C.F.R. § 
3.352(a) (2010).

A veteran will be found to be bedridden if the condition actually 
requires that he remain in bed, but not if he voluntarily stays 
in bed or if a physician merely recommends bed rest. It is not 
required that all of the disabling conditions enumerated in this 
paragraph be found to exist before a favorable rating may be 
made. The particular personal functions that the Veteran is 
unable to perform should be considered in connection with his or 
her condition as a whole. It is only necessary that the evidence 
establish that the Veteran is so helpless as to need regular aid 
and attendance, not that there be a constant need. 
Determinations that the Veteran is so helpless as to be in need 
of regular aid and attendance will not be based solely upon an 
opinion that the claimant's condition is such as would require 
him or her to be in bed. They must be based on the actual 
requirement of personal assistance from others. Id.

Although a veteran need not show all of the disabling conditions 
identified in 38 C.F.R. § 3.352(a) to establish entitlement to 
aid and attendance, the Court has held that it is logical to 
infer there is a threshold requirement that "at least one of the 
enumerated factors be present." See Turco v. Brown, 9 Vet. App. 
222, 224 (1996).

The medical evidence currently associated with the Veteran's VA 
claims folder is absent an opinion as to the effect of his 
service-connected disabilities on his need for aid and 
attendance. In light of the foregoing, the Board is of the 
opinion that a clarifying VA examination would be probative in 
ascertaining the effect of the Veteran's service-connected 
disabilities on his need for aid and attendance. See Charles and 
McLendon, both supra; see also 38 C.F.R. § 3.159(c)(4).

Accordingly, the case is REMANDED for the following action:

1. Schedule the Veteran for an appropriate VA 
examination to determine the nature, 
extent, and etiology of his hypertension, 
erectile dysfunction, skin disability, and 
enlarged prostate. The claims folder 
must be made available to and be 
reviewed by the examiner in 
conjunction with the examination. All 
indicated tests should be conducted. 

The examiner must provide an opinion as to 
the following:

a. whether the Veteran currently 
suffers from hypertension;

b. if the Veteran currently suffers 
from hypertension, whether it is 
at least as likely as not (50 
percent or greater) that the 
hypertension is related to his 
military service, including his 
conceded in-service exposure to 
herbicides, or was caused or 
aggravated (i.e. permanently 
worsen beyond the normal 
progression of the disability) by 
his service-connected diabetes 
mellitus. If the examiner finds 
that hypertension is aggravated by 
the service-connected diabetes 
mellitus, then he/she should 
quantify the degree of 
aggravation; 

c. whether the Veteran currently 
suffers from erectile dysfunction;

d. if the Veteran currently suffers 
from erectile dysfunction, whether 
it is at least as likely as not 
(50 percent or greater) that the 
erectile dysfunction is related to 
his military service, including 
his conceded in-service exposure 
to herbicides, or was caused or 
aggravated (i.e. permanently 
worsen beyond the normal 
progression of the disability) by 
his service-connected diabetes 
mellitus. If the examiner finds 
that erectile dysfunction is 
aggravated by the service-
connected diabetes mellitus, then 
he/she should quantify the degree 
of aggravation; 
 
e. whether the Veteran currently 
suffers from a skin disability;

f. if the Veteran currently suffers 
from a skin disability, whether it 
is at least as likely as not (50 
percent or greater) that the 
skin disability is related to his 
military service, including his 
conceded in-service exposure to 
herbicides; 

g. whether the Veteran currently 
suffers from an enlarged prostate;

h. if the Veteran currently suffers 
from an enlarged prostate, whether 
it is at least as likely as not 
(50 percent or greater) that the 
enlarge prostate is related to his 
military service, including his 
conceded in-service exposure to 
herbicides; 
 
i. whether the Veteran's service-
connected disabilities prevent him 
from securing and following 
substantially gainful occupation;

j. address the effect of the 
Veteran's service-connected 
disabilities on his need for aid 
and attendance.

The examiner should indicate in 
his/her report that the claims file 
was reviewed. A complete rationale 
for any opinion expressed should be 
provided. 

Note: The term "at least as likely as 
not" does not mean merely within the 
realm of medical possibility, but rather 
that the weight of medical evidence both 
for and against a conclusion is so evenly 
divided that it is as medically sound to 
find in favor of causation as it is to 
find against it.

2. When the development requested has been 
completed, the case should be reviewed by 
the RO on the basis of additional 
evidence. If the benefits sought are not 
granted, the Veteran and his 
representative should be furnished a 
supplemental statement of the case (SSOC) 
and be afforded a reasonable opportunity 
to respond before the record is returned 
to the Board for further review.

The Veteran has the right to submit additional evidence and 
argument on the matter or matters the Board has remanded. See 
Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law 
requires that all claims that are remanded by the Board of 
Veterans' Appeals or by the United States Court of Appeals for 
Veterans Claims for additional development or other appropriate 
action must be handled in an expeditious manner. See 38 U.S.C.A. 
§§ 5109B, 7112 (West Supp. 2009).

______________________________________________
DAVID L. WIGHT
Veterans Law Judge, Board of Veterans' Appeals

 Department of Veterans Affairs